Carl McFarlin v. Commissioner.
McFarlin v. Commissioner
Docket No. 106526.
United States Tax Court
1943 Tax Ct. Memo LEXIS 427; 1 T.C.M. (CCH) 703; T.C.M. (RIA) 43109; March 1, 1943
*427 John S. Glenn, C.P.A., American Nat'l Bank Bldg., Nashville, Tenn., and William Waller, Esq., for the petitioner. John R. Stivers, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case involves a determination of a deficiency in petitioner's income tax liability for the year 1938 in the amount of $12,966.65. The petitioner contends that the respondent erred in such determination with respect to three separate items: 1. The disallowance of a deduction of traveling and entertainment expense of $900, and automobile expense of $900. 2. The addition to petitioner's taxable income of the face value of notes aggregating $25,149.51 received by petitioner in 1938, but paid when due in subsequent years. 3. The addition to petitioner's 1938 taxable income of the sum of $12,312.17 withdrawn by petitioner from his employer over the period from 1932 to 1936, which sum was to have been cancelled by agreement in 1936, but which was carried on the employer's books until 1938 without the knowledge or consent of petitioner. Findings of Fact Petitioner filed his return for the year 1938 on a cash receipts and disbursements basis with the collector at Nashville, Tennessee. *428 Petitioner entered the employment of the Black Diamond Coal Mining Co. (hereinafter referred to as "Black Diamond"), on July 4, 1924, as a mine superintendent. On January 1, 1927, Black Diamond's president, upon learning of petitioner's intention to leave the company to accept an offer of employment elsewhere, agreed to increase petitioner's salary from $300 per month to $500 per month, with the provision that $100 of the increase would be paid him each month, and $100 would be accrued on the books of the company to the petitioner's credit, to be later invested, together with funds to be furnished by Black Diamond, in some business enterprise to be determined upon at a future time. In 1929, as a result of the petitioner's efforts, a lease was secured by Black Diamond on property known as the Whitwell Mine, and the following letter was written by Black Diamond to petitioner on October 4, 1929: Birmingham, Alabama October 4th, 1929 Mr. Carl McFarlin City Dear Sir: Having taken a lease on the Whitwell Mines and extended out operations, thereby increasing your duties, we have and do hereby agree that the net earnings of the Whitwell Mine operation shall be applied to and credited *429 against all sums advanced for purchase and equipment, and that when such net earnings shall equal the amount so furnished, you shall immediately become entitled to and receive a fifteen per cent (15%) interest in the Whitwell Mine and property, which said 15% interest shall entitle you thereafter to receive a sum equal to 15% of the net earnings of said operation, and on any sale of said property to 15% of the sales price. This agreement is given you in part in consideration of extra duties and responsibilities placed upon you, and is also given you in part in lieu of paying to you in cash a sum equal to the back salary now due you." Yours yery truly, BLACK DIAMOND COAL MINING COMPANY By C. S. Bissell President. Beginning in 1932, and continuing through the first part of 1936, petitioner withdrew from Black Diamond sums of money in excess of his salary aggregating $12,312.17. Petitioner requested these sums in the belief that his interest in the mine either had vested or soon would, under the terms of the above letter. Black Diamond contended that petitioner's 15% interest in the property had not vested, and denied his right to retain the money so withdrawn. No audit was ever *430 made from which it could be determined when or whether such interest vested, and whether petitioner was entitled to the money which he received. The dispute over the extent of petitioner's interest in the mine, and his right to the sums so received by him was more or less continuous, and increasingly intense, throughout the period, and Black Diamond treated the withdrawals as loans on its books. Petitioner did not include in his income tax return for those years any of the amounts so received. In 1936, partly because of the existence of this controversy, Black Diamond and petitioner decided to dispose of their interests at the mine. On July 15, 1936, petitioner and Black Diamond entered into a contract by the terms of which Black Diamond agreed to sell the lease and property at the Whitwell Mine on terms therein enumerated, and to cancel the indebtedness carried on its books by reason of the withdrawals by petitioner, aggregating $12,312.17, in consideration of the acceptance by petitioner of 15% of the sale price in full satisfaction of all claims for participation by petitioner in the earnings and property at the mine. This contract was in the form of a letter addressed to petitioner, *431 the pertinent parts of which are as follows: There exists now a controversy between you and the company as to the extent of your interest in the Whitwell property and the value thereof. You have drawn ahead of your salary from the Black Diamond Coal Mining Company a substantial sum of money which is being carried as an open account on the company's books. It is distinctly understood that nothing said in this letter nor in any other correspondence with reference to this proposed sale of the Whitwell properties nor anything that may be said by any party in any negotiation shall be used in anywise by your attorney or anyone else on your behalf or by yourself or by us or anyone on our behalf as evidence or as admissions by either party as to actual value of Whitwell properties, or in any way to affect the above mentioned controversy. Black Diamond Coal Mining Company will sell to a buyer of reasonable financial responsibility all its holdings at Whitwell, Tennessee, including buildings, mining fixtures, cars, tracks, washer machinery and all of the physical properties owned by it and located in Marion County, Tennessee, provided the purchaser will assume the payment of the indebtedness *432 hereinbefore mentioned to the Tennessee Coal Iron and Railroad Company and assume all obligations under the lease under which it is operating at Whitwell and pay Black Diamond Coal Mining Company the further sum of Two Hundred Thousand ($200,000.00) Dollars. The payment of $200,000.00 shall be made on such terms as may be mutually agreed upon between the purchaser and seller, provided that the seller may have the right to demand that at least $50,000.00 of this purchase price (exclusive of the $30,000.00 assumed) be paid cash upon delivery of possession and that the balance be paid at the rate of not less than $50,000.00 per year and provided further that the seller may, if deemed preferable for any reason whatsoever, require that the purchaser pay less down and less per year than herein specified. All deferred payments to bear interest at the rate of 6% payable semi-annually and to be secured by a vendor's lien evidenced by a mortgage on the properties sold and the lease. This is conditioned upon your accepting 15% of the full purchase price, including 15% of the $30,000.00 indebtedness to be assumed by the purchaser, as and when the same shall be collected (the $30,000.00 assumed *433 by the purchaser to be treated as collected when it is paid the Tennessee Coal Iron and Railroad Company) and 15% of commissary inventory as representing your full interest in the Whitwell property and operations and in full satisfaction of all claims against Black Diamond Coal Mining Company provided, of course, Black Diamond Coal Mining Company will cancel its claims against you for money advanced prior to the date hereof. You understand that one of the reasons Black Diamond Coal Mining Company is willing to enter into this agreement is to avoid the unpleasantness of a controversy with you over the extent and value of your claims for the participation in the earnings and property at Whitwell and if this sale shall be made, the amount you receive of the consideration paid by the purchaser for Whitwell shall be accepted by you as full satisfaction of all claims against Black Diamond Coal Mining Company and Black Diamond Coal Mining Company will in turn surrender all claims it has against you. In attempting to sell this property you are obligated to obtain the highest purchase price possible. The consideration herein above mentioned is the minimum which will be accepted. * * * * *434 *
Under no circumstances will Black Diamond Coal Mining Company consider itself bound by the price herein fixed beyond sixty days from the date hereof. * * * * *
In consideration of five dollars to us paid, we hereby give you an option to purchase on above terms for sixty days. On July 31, 1936, Black Diamond gave one Paul M. Davis an option to sublease with option to purchase the lease and property at Whitwell Mine, and thereafter, on September 15, 1936, the mine was subleased for two years, with option to purchase, to Whitwell Smokeless Fuel Co., a corporation organized for that purpose. On August 21, 1936, Black Diamond and petitioner entered into another agreement settling their differences, which was contingent upon a non-exercise of the option to lease and purchase previously executed to Paul M. Davis. This agreement was in the form of a letter written by Black Diamond to petitioner, and accepted by him. This letter reads as follows: Beginning not later than September 15, 1936, the Black Diamond Coal Mining Company will employ you in your present capacity at the salary of Eight Hundred Thirty Three and 33/100 ($833.33) Dollars Per Month. This contract of employment to *435 be terminable by either party on thirty days' notice. We have paid you certain money in the past which stands on our books as accounts receivable payable from you to us. This account will be charged off of our books and you released from liability therefor in consideration whereof you in turn release us from all claims for participation in earnings or profits made at any time at Whitwell operations including specifically claims made by you under letter dated October 4, 1929. We further agree to pay you the sum of Thirty Thousand ($30,000.00) Dollars to be paid Six Thousand ($6,000.00) Dollars on or before the 15th day of September, 1936, balance in twelve equal payments of Two Thousand ($2,000.00) Dollars each, the first of such payments falling due January 1, 1937, and one on the first of each third month thereafter (viz, April 1st, July 1st, October 1st, etc.) until all are paid. Said deferred payments to be evidenced by promissory notes dated September 15th, 1936, bearing interest at six per cent (6%) per annum from their dates, all of said notes being payable on or before maturity. When said Thirty Thousand ($30,000.00) Dollars has been paid to you, you do now agree that you *436 will release and surrender to this company any interest that you may have under letter or contract dated October 4, 1929, or otherwise in the lease or physical properties of Black Diamond Coal Mining Company at or near Whitwell, Tennessee. This entire contract is a conditional one, however, there is now outstanding to you an agreement executed by us on July 15, 1936, giving you or your assigns certain rights to purchase our Whitwell properties. That contract contains a memorandum of an agreement between you and us settling and compromising claims by you against us arising out of the contract of October 4, 1929. It is now understood that if we are called upon to, and do convey, our Whitwell properties to you or your assigns under the contract of July 15, 1936, the settlement embodied in that contract of your claims against us shall prevail. If we do not perform under the contract of July 15, 1936, then your controversy with us shall be governed by this contract. In recognition of this contingency, it is now agreed that we will place with J. A. Simpson, of Birmingham, Alabama, as escrow agent, our certified check for Six Thousand ($6,000.00) Dollars and the notes for Twenty Four Thousand *437 ($24,000.00) Dollars hereinabove described. If we shall not have conveyed our properties pursuant to said option agreement dated July 15, 1936, on or prior to the 15th day of September, 1936, the said escrow agent shall deliver the check and notes above mentioned to you. In the event we should later convey our properties pursuant to contract dated July 15th, 1936, then your claims against us shall be governed by the provisions contained in that contract and this contract shall be null and void. All sums which may have been paid you under this contract will be considered as credits on the first sums which may accrue to you under said contract of July 15, 1936, in the event it is performed. The effect hereof is that your claim under letter of October 4, 1929, has been settled; settlement being governed by the terms of option of July 15, 1936, in the event said option shall be exercised; said settlement on the contrary being governed by the terms hereof in the event that option shall not be exercised. We also gave to Paul M. Davis under date of July 31st, 1936, an option to lease and buy our Whitwell properties. If we should be called on to and do perform our obligations under that *438 contract then in that event this contract shall be null and void and your claims against us under the letter of October 4, 1929, shall be settled as provided in the instrument of July 15, 1936, with the addition that you shall receive fifteen per cent (15%) of the rent, royalties, payments for supplies, commissary inventory, insurance adjustments;etc. collected by this company from Paul M. Davis. Concurrently with the execution of the lease with option to buy (September 15, 1936) Black Diamond and petitioner entered into a third contract finally delineating the rights of the parties in the light of that disposition of the mine. Petitioner's interest in the mine was set forth in substantially the same terms as were contained in the July 15, 1936, agreement, and Black Diamond agreed to cancel and satisfy all of the indebtedness of McFarlin to Black Diamond. Some additional provisions were included, relating mainly to the relationship of the parties in the event the option to purchase within two years should not be exercised. This contract is as follows: * * * * *
(1) WHEREAS, Black Diamond, pursuant to and in accordance with an agreement heretofore made and entered into between *439 Black Diamond and Paul M. Davis and associates of Nashville, Tennessee, on the 31st day of July, 1936, (subsequently and in compliance with its terms Paul M. Davis et al. have caused to be charted under the laws of Tennessee a corporation known as Whitwell Smokeless Fuel Company, a corporation); and (2) WHEREAS, Black Diamond has leased its mining properties, equipment, machinery, washer, supplies, cars, tracks, and buildings, situated at or near Whitwell, Marion County, Tennessee, to said Whitwell Smokeless Fuel Company, a corporation, in accordance with the terms of said agreement, which said agreement also provided that such corporation or its assigns were granted an option to purchase the lease on said mines and properties described in said contract of July 31st, 1936, at any time within two years from date of September 15, 1936, for a consideration therein set forth; and whereas McFarlin claims to own an undivided fifteen per cent interest in said Whitwell mine and property; and (3) WHEREAS, Black Diamond claims that McFarlin is indebted to it in a substantial amount on account of certain monies heretofore paid to McFarlin and charged to him on the books of Black Diamond as *440 advance on salary, which account McFarlin denies; and whereas the parties hereto, Black Diamond and McFarlin, are desirous of settling, compromising and adjusting all of their respective claims, differences and existing equities, including all claims of McFarlin against Black Diamond arising out of that certain instrument dated October 4th, 1929; (4) NOW THEREFORE, in consideration of One Dollar ($1.00) in hand paid by Black Diamond to McFarlin, the receipt whereof is by these presents acknowledged, and other good and valuable considerations, it is hereby mutually covenanted and agreed as further considerations between Black Diamond and McFarlin as follows: (5) Black Diamond agrees to pay McFarlin fifteen per cent of the net price received for the stock of goods delivered to Whitwell Smokeless Fuel Company, a corporation, which stock of goods is located in the commissary at said mine, and said inventory is to be taken as of the date that said Whitwell Smokeless Fuel Company, a corporation, actually acquires possession under the lease and option aforementioned, less claims against Black Diamond on account of said commissary, other than claims for goods purchased, provided such claims *441 are presented within ninety days from date; (6) Black Diamond agrees to pay to McFarlin fifteen per cent of all net monies which may be paid it by Whitwell Smokeless Fuel Company, a corporation, under the provisions of said contract of lease for or on account of the proration of all types or kinds of insurance premiums described and provided for therein; (7) Black Diamond agrees to pay to McFarlin fifteen per cent of all monies received by it in payment for supplies, except roofing, removed and paid for by Whitwell Smokeless Fuel Company, a corporation, from the supply house under said sublease during the period thereof, as provided therein; (8) Black Diamond agrees to pay to McFarlin fifteen per cent of all net payments of rental and royalties received by it under said contract of lease during the period thereof. In arriving at the net amount to be divided, the State and County taxes shall be deducted in advance of payment date, in equal monthly installments. Income taxes are payable by each party on his share of the receipts; in the event, however, a different method of payment is contended for by the taxing authorities, the Black Diamond may require McFarlin to give it a bond *442 with surety to be approved by it to indemnify it against loss from having paid to him any amount necessary to cover such tax claim; (9) IT IS FURTHER AGREED that in the event of the exercise of said option to purchase Whitwell mine and property by Whitwell Smokeless Fuel Company, a corporation, or its successors or assigns, that McFarlin, his heirs and assigns, shall be paid by Black Diamond fifteen per cent of the net amount received; (10) AS A FURTHER CONSIDERATION, McFarlin shall be relieved of all obligations to pay to Black Diamond any monies for or on account of any indebtedness of McFarlin to Black Diamond which was created prior to the 15th day of July, 1936, or of any so-called accounts, salary accounts, advancements or charges upon the books of Black Diamond prior to the last above mentioned date, all of which indebtedness shall be cancelled and satisfied in full by Black Diamond; (11) FOR FURTHER CONSIDERATION, it is agreed that in the event Whitwell Smokeless Fuel Company does not purchase said Whitwell mine and property and same is retaken by Black Diamond, Black Diamond shall pay to McFarlin fifteen per cent of the net earnings of said property, if operated by Black *443 Diamond thereafter, or fifteen per cent of the net receipts from any lease thereof, in the event same shall be leased to another, or fifteen per cent of the net amount received, in the event same shall be sold to another; (12) AS A FURTHER CONSIDERATION, McFarlin, upon faithful performance of this agreement upon the part of Black Diamond, hereby agrees to discharge and acquit Black Diamond of all obligations to pay any monies for or on account of any claims which McFarlin may have or claim to have against Black Diamond for and on account of earnings of Black Diamond in the Whitwell operation prior to delivery of possession of said properties to Whitwell Smokeless Fuel Company, a corporation; (13) In the event Black Diamond retakes said mine and property and proposes to operate same, it shall have the option, within thirty days after it is in possession of said mine and property, to purchase McFarlin's interest therein for Thirty Thousand ($30,000.00) Dollars, payable Ten Thousand ($10,000.00) cash and balance One Thousand ($1,000.00) per month, with six per cent interest. (14) It is expressly understood that all payments due, or to become due under this agreement shall become due *444 and payable to McFarlin as and when received and collected by Black Diamond. * * * * *
Thereafter, Black Diamond closed the account known as "C. McFarlin Loan Account," but, without the knowledge or consent of petitioner, established an account known as the "C. McFarlin Special," which was carried on its books until April 12, 1938, when it was finally charged off. On April 1, 1938, the Tennessee Products Company, assignee of Whitwell Smokeless Fuel Co., exercised the option to purchase the lease and equipment at the mine. Of the sale price, petitioner received as his share $8,383.17 in cash in 1938, and three notes for that amount each, payable on December 1st of 1938, 1939 and 1940, later extended to April 1, 1939, 1940 and 1941, on which later dates the principal and interest of the respective notes were paid in full. Petitioner included in his income tax return for 1938 the amount of cash which he received by reason of the sale, $8,383.17, and included in his returns for 1939, 1940 and 1941, the amounts which he received when the notes were paid in those years. In his income tax return for 1938, petitioner deducted the sum of $4,861.84 for traveling, entertainment and automobile *445 expenses. Of that amount, respondent disallowed $900 traveling and entertainment expense, and $900 automobile expense, or a total of $1,800. During the taxable year, petitioner was allowed an undisclosed amount by his employer for traveling and automobile expense, but it was not sufficient to cover such expenses. Petitioner was forbidden by his doctor to drive his own car, due to a little hemorrhage in his eye and high blood pressure. He therefore employed a boy to drive his car to and from petitioner's office, to and from the railroad station, and to and from the airport, when petitioner required his services. The remainder of his time was spent working at petitioner's home as a houseboy, subject to the direction of petitioner's wife. For the expenses so incurred, petitioner deducted $900, as the value of the salary and board furnished this employee. Petitioner kept no detailed record of the amounts spent for entertainment and travel. His method of determining such amounts was to subtract the amount in his pocket when he returned from a trip from the amount which he had when he left, and to consider everything he spent while away from home a deductible expense. Respondent disallowed *446 $900 of the deduction claimed for these expenses. Opinion KERN, Judge: We shall dispose of the three questions involved in this proceeding in the order in which they are presented in petitioner's assignment of errors, rather than in the order in which they have been treated in our findings of fact. Petitioner claimed a total deduction in his 1938 tax return of $4,861.84 for traveling, entertaining and automobile expense. Of this amount, respondent disallowed $900 of the estimated traveling and entertainment expenses, and $900 claimed as automobile expenses. Petitioner's method of determining his expenditures for traveling and entertainment consisted of subtracting the amount of money he had when he returned from a trip from the amount he had when he left home, and considering the difference as his deductible expenditures for these purposes. Apparently no effort was made by petitioner to comply with the respondent's regulations relative to the presentation of records or statistics to support his claim of deductions, and no evidence was offered in this proceeding which would indicate how extensively petitioner traveled, other than his assurance that he considered his estimate conservative. *447 In the absence of some more effective challenge of the correctness of the Commissioner's determination, we do not feel justified in overthrowing it. It is true that under the authority of Cohan v. Commissioner, (C.C.A. 2) 1930, , petitioner is entitled to a reasonable allowance for such expenses, despite his failure or inability to itemize them accurately. But a considerable allowance has been made. The Commissioner has disallowed only $900 of the total deduction claimed for this purpose, and we can not say, on the basis of the evidence presented, that such determination was in error. With respect to the item claimed as automobile expenses, the facts established by petitioner's own evidence seem to substantiate, rather than dispute, the correctness of the respondent's determination. Petitioner suffered some minor physical disabilities, as a result of which his physician had advised him not to drive his own automobile. Petitioner therefore employed a chauffeur who drove him to and from his office, to and from the airport and to and from the railroad station. When not so occupied, the chauffeur was required to work at petitioner's home *448 as a houseboy, under the supervision of petitioner's wife. The evidence established this item to have been a personal expense of the petitioner. It is well settled that the expense of "commuting" to and from a taxpayer's place of business is not deductible as a business expense, whether by automobile or otherwise. ; , affirmed . Even if such an expense were allowable, in this instance it appears probable that the major part of the employee's time was otherwise spent, in the service of petitioner's family, and no attempt has been made to allocate the portions of his time devoted to the two pursuits. In connection with this item, petitioner has not shown error in the Commissioner's determination. Respondent added to petitioner's taxable income for 1938 the sum of $25,149.51, which represented petitioner's share of the proceeds of the sale of the lease and property at the Whitwell Mine. Petitioner received $8,383.17 in cash in 1938, and three notes in that amount each, payable in one, two and three years, respectively. Petitioner, *449 consistent with his theory in this proceeding, reported and paid the tax on the $8,383.17 cash received by him in 1938, and reported and paid taxes in the three immediately following years on the amounts received in those years in retirement of the notes. Petitioner contends that the sale of his interest in the lease and property was a sale of a capital asset on the installment plan, and that he was therefore correct in returning in 1938 only the cash received in 1938. Respondent urges that the petitioner received the notes representing the purchase price of his 15% interest in the property in compensation for services, and that, therefore, under the provisions of regulations 101, Art. 22 (a)-4, petitioner was required to include in his 1938 income the fair market value of the notes, as well as the cash received; and this fair market value was determined to be the face value thereof. Respondent's argument on this issue seems to be that petitioner's interest in the mine property never vested; that his claim against Black Diamond for additional compensation under the contract of 1929 was never satisfied; and that the notes which he received as a result of the sale of the mine property *450 should be considered as the payment of such claim for additional compensation. We do not agree with the major premise of this argument. As we construe the agreements of 1936, they recognized and established in petitioner a fifteen percent interest in the property as called for in the agreement of Black Diamond which was made in 1929. Therefore, the notes must be considered as received by petitioner in payment for his interest in such mine property and not in payment for services. Therefore, the Regulation above cited is inapplicable and respondent's argument must fail. The fact that petitioner's interest in the property was acquired directly or indirectly as a result of his services to Black Diamond is immaterial. When he sold that interest two years after its acquisition, it was the sale of a capital asset. Since the initial payment did not exceed 30% of the total selling price, the taxpayer was entitled to treat it, as he did, as an installment sale. Respondent erred in including the value of the three notes in petitioner's 1938 income. The final question for our consideration is whether petitioner has shown the Commissioner's determination to have been in error in including in *451 petitioner's 1938 income the $12,312.17 representing advances to petitioner during the years 1932 to 1936 in excess of his salary, which such advances were, by the terms of the 1936 contracts, to have been charged off or cancelled. While the account in which the amount had been carried was closed in 1936, the same amount was set up in another account and carried until 1938, when it was finally cancelled and closed. This latter account was established without the knowledge or consent of petitioner. Petitioner advances the theory that the cancellation of this amount, if it occurred in 1938, constituted a gift to him in that year; or, in the alternative, that the amounts aggregating the total were income as and when he received them in the years 1932 to 1936, inclusive. Under the facts shown, we can only say there is no shred of evidence of any donative intent on the part of Black Diamond, and no indication that petitioner seriously regarded the cancellation as resulting in a free gift to him at the time, or since. He has at all times contended that he was entitled to the amounts received, and possibly more, as a matter of right. This contention was as consistently denied by Black *452 Diamond until the various compromise agreements, reciting as one of their principal objects the settlement of the long-standing controversy, were finally reached in 1936. Then, for the first time, Black Diamond admitted petitioner's right to retain the sums so advanced. The respondent suggests that the agreement by Black Diamond to cancel petitioner's indebtedness to it was contingent upon a sale of the property under the lease with option to buy, and that, since the sale was not made until 1938, Black Diamond's obligation to cancel the indebtedness did not ripen until that year. We do not agree with that construction of the contracts. When all of these contracts are read together in the light of the other evidence in the record, the intention of the parties seems clear: to provide that in any event and regardless of any contingency (1) petitioner's interest in the Whitwell mine be recognized and paid for, and (2) petitioner be free from any obligation to return to Black Diamond any part of the advances made to him and concerning the treatment of which the parties were in disagreement. The various agreements were made to effect that purpose regardless of whether the mine property *453 was leased, sold or repossessed by Black Diamond. They were not made for the purpose of imposing contingencies upon the effectuation of these purposes but to provide against any contingencies that might arise in the disposition of the property. The question whether amounts withdrawn as advances, subject to a later determination of the exact amount due, or the happening of some contingency, constitute income prior to that determination or the happening of that contingency has frequently arisen. In the case of , cited by respondent, under a contract of employment by which the taxpayer was to receive a certain salary and a percentage of the profits of the project on which he was working, the taxpayer received certain sums in 1920 in addition to his salary, which sums were shown on the books of his employer as having been advanced and carried as an account receivable. At the end of 1921, the project was completed, the company's net profits were ascertained, and the petitioner was credited on the books with his share of such profits, amounting to about $5,000 more than the aggregate of the advancements which the petitioner *454 had received. It was held that since the amount due petitioner under his contract was not and could not have been determined until 1921 the amounts received by petitioner were properly treated as loans in 1920, and constituted income in 1921 at the time of such determination. On the basis of that reasoning, the amounts which had theretofore been advances ripened into income to petitioner in the instant case at the time his right to retain them became absolute, which was in 1936. The fact that Black Diamond chose without the knowledge or consent of the petitioner to carry on its books a "special account" in the same amount for two years after it agreed to and did cancel the "loan account" can not be allowed to prejudice petitioner's rights. The agreement to cancel was unequivocal and in praesenti and the loan account was, in fact, cancelled. At that time, the amount became income to petitioner. No indebtedness thereafter existed on account of these advancements, and we are not interested in Black Diamond's treatment of The Commissioner erred in including in petitioner's 1938 taxable income the sum of $12,312.17, representing the advancements to petitioner. Decision will *455 be entered under Rule 50.